Our next case this morning is No. 18-2269, X'An Metals & Minerals v. United States. Mr. Salzman. Manigas. Manigas is first. Okay. Thank you. May it please the Court. We're here on behalf of X'An Metals because we believe that for a single reason, the surrogate value of low-carbon steel, which we believe has inflated our margin about 50%, so we had a 72% in the final results, and we believe 50% of that is from this single decision, where the Department selected a value for low-carbon steel, which is the majority of the steel used in our nails, that was 26% higher than 14 benchmark prices that we put on the record. And so that's a very high number for a commodity steel, and we can see the massive impact it had on the company's margin. And so what I'd like to do is talk about two issues, and my colleague, Mr. Salzman, will address the remaining issues in a rebuttal. I'd like to talk about the evidence of government distortion in the Thai import values and then go over the benchmark prices with you. And the lower court jurisprudence cited in our brief indicates that when you can make a linkage between the government distortion and the inflated values, you have a case that the Department has to reconsider its surrogate value selection. And so with that, turning to the USTR reports at pages 21 through 23, we bolded certain lines, and I'd like to read perhaps just four of them, if the Court would indulge me, from the various sources. We have multiple annual reports of the U.S. Trade Representative, the FedEx Country Report, and the Commerce Department's own export report. So turning to page 21, the USTR report, the Thai authorities would, quote, arbitrarily increase the customs value of imports. Turning to page 22 of our brief, the FedEx Country Report says that Thai customs keeps records of the highest declared price of products, and then regularly What do you make of the criticism that those reports are speaking generically and they're not speaking to the exact product at issue in this case? Right. Well, my fourth sentence was going to be from the Department, Commerce Department's own report on page 23. The Thai authorities, quote, repeatedly use arbitrary values. In other words, there's no limitation in these reports that they're only used for particular products. And steel is a strategic product. We look at the President's 232 tariffs. He didn't go and put the tariffs on zinc plating for the nails. He went after steel first because it's a strategic product. But there's nothing in these reports that mentions steel in particular. That's right, but what the reports say And what products are mentioned specifically, cigarettes and alcohol? But those are just examples. Is that correct? Yes, yes. So are there other examples besides cigarettes? I'm not mentioning the reports. Those are just examples. The reports say that the Thai authorities are pervasively increasing the values. They're generating revenue by insisting that importers pay the highest indicative price from a previous period. So the Thai authorities' interest is in generating revenue by maintaining the highest possible prices based on previous quarter benchmarks that they call indicative prices. And so it's not logical that they would only go after two products in a huge range of products. And we have the evidence in the benchmarks as well. So, I mean, I don't really want to In reading those reports and understanding what they stand for, that's something that we view commerce as determination for under the substantial evidence standard, right? Well, that's the base standard. But I would suggest the standard is a lot lower to disregard the Thai imports. And, for example, in multiple respects, but if you look to turn to page 28 of our brief, what commerce has done for Thailand, they found some generally available export subsidies available to exporters when they export from Thailand. And they said because some companies and some products were once found to be subsidized in their exports, we're going to disregard all Thai exports forever as surrogate value inputs. In other words, having found distortion once for a few products, they've now painted Thai exports with a broad brush, all exporters, all products, and their values will forever be disregarded by the department. And that practice exists to this day. And the problem is it's government interference. Now, there's another context for this where if they find government subsidies on a financial statement, the congressional intent says if you have reason to believe or suspect government interference, we will disregard the financial statement. And commerce has almost a blanket rule to disregard all financial statements with any evidence of subsidies. So I had a case that I lost when we had zero for the subsidy. It was an Indian case where there was a packing credit. And I said, but it's zero. And the court said, we don't care. It proves the government was interfering in the company's operations. And it's the reason to believe or suspect standard. And so that's very low. It's not substantial evidence. And particularly when we look at how they disregard all Thai exports, we think these USTR reports are equally as persuasive in suggesting there's a real problem with the Thai imports. I understand your position that commerce is using a reason to believe standard, right? But our review of their determination is substantial evidence, that a reasonable fact finder could find that there's reason to believe, right? They're using a substantial evidence test. But what I'm suggesting in other narratives. When you say they, who are you referring to? The Commerce Department. The Commerce Department is using a substantial evidence test. But what I'm suggesting in the context of financial statements, in the context of Thai exports, so if you were using India as the main surrogate country and some of the import values commerce likes to use were from Thailand, they'd all be carved out and not used. I don't understand what you mean that commerce is using a substantial evidence test. We use a substantial evidence test, but why do they use it? Right. Well, Judge Stoll is asking what standard is being applied. I want to know what standard we applied to review of commerce's determination. Right. And I'm saying that is the framework standard, but there are some lower standards that commerce uses in the specific context of surrogate values where it will disregard certain data sets as unreliable. What is your basis, though, for saying that commerce applies a substantial evidence standard? Well, what I meant to say is that commerce is using actually a lower standard in similar contexts where there's government interference in the market for financial statements and all Thai exports. And so we're saying why don't they also use that standard for Thai imports when we have these USTR reports? We don't have these USTR reports against Ukraine and the Philippines, which were our alternative surrogate countries. So why aren't those sources better than a country where there's pervasive Thai interference in imports specifically to raise the values and collect additional revenue? So that's our argument. But even the lower courts, who have not ruled specifically on the USTR reports and they were applying the substantial evidence test, said when you link the government interference to the higher prices compared to various benchmarks, then there's a cause for a remand. And we think that in that case, for example, as Jacoby cited on page 14 and 15 of our brief, they say when there's a linkage, then you really have a problem and the agency's got to revisit this issue and explain more about why these values are justified. If we follow the direction you're trying to go in, how do we keep ourselves from having to evaluate the political temperature and the official behavior of every country that commerce wants to use as a surrogate? Well, these reports aren't talking about political temperature. Where is the line to be drawn? For example, in the USTR reports, on this record, there's a USTR report about Thailand and not about the other countries. So we're paying attention to the USTR, which is a government agency that is expert in evaluating distortion. And this distortion goes towards increasing the import values to generate revenue. So it's directly relevant to the exercise here, which is to provide a neutral, fair, assertive value, the best available information for Xi'an Metal's low-carbon steel imports. So commerce would have to apply this rule disregarding the Thai data as to all products? That's right. And commerce has already moved off of Thailand, so this is kind of a historical exercise for us here. They're no longer relying on Thailand. But at this time, they were the only company with all these reports. It was the USTR, it was FedEx, and it was the Commerce Department's export division, having all these serious concerns about the Thai import values. And we backed that up with the benchmark information that's listed at page 1617 of our brief. And it seems like Mrs. Altman may be able to address that more. But I would, you know, for example, I'd maybe just paint, since I have very little time, turning to page 17. You can see that most of that part of the chart is all the biggest Thai producer of steel wire rod in Thailand. It's a domestic price, starting at 635 for low-carbon steel. Now the bottom four come right from Tata Steel's financial statements covering our POR 2013 and 14. They're in the 600 to low 700 range. The courts have also said, you know, you've got to pay attention to those benchmarks because if you're pretending that Xi'an Metals is operating from Thailand, why are you assigning to them a raw material cost that's 26% higher than what would be available from the largest steel producer in Thailand? So that, we feel, is a very persuasive benchmark. And it's actually, you know, with respect to the bottom four numbers, even a little bit adverse to us because it includes some high-carbon steel. So that's why we think that low-carbon quote at 635 is much more relevant. I'm going to cede the rest of my time to my colleague, if that's okay. Is she going to argue in rebuttal? She's going to argue, yes. I'm past my, a lot of time. Okay. But it's up to the court. Thank you. Okay. Ms. Bae, is that how you pronounce it? Yes, Your Honor. Didn't we recently have another case involving this same issue about the Thai data? Am I mistaken? No, Your Honor. You did recently, I think pretty recently, have a case, and I was actually going to bring that up. I believe, Your Honor, it might be referring to the Guangdong case, which was a review of the Court of International Trades decision in the LK manufacturing case, which did address this very issue of the appellant in that case, which I believe might have even been that same counsel trying to use these USTR and other reports to show that the Thai data was unreliable. And in that Guangdong case that this court recently heard, this court did affirm, albeit without opinion, the determination of the Court of International Trade that the generalized concerns or concerns with respect to cigarettes and alcohol that were posed in the reports were not enough to constitute a reason to believe or suspect that there was dumping or subsidizing with respect to these specific products. Is this issue involved in yet other cases, or is this the only remaining case? I'm not sure if this issue... I'm not sure that there are any other cases that are currently pending in which this issue is being argued. However, I know that there were several Court of International Trade decisions within the last few years dealing with this issue, and I believe basically all of them stated that these generalized concerns were not enough, that Congress's determination that these generalized concerns were not enough to render the Thai data unreliable as to specific inputs was reasonable and supported by substantial evidence. You're saying there's other CIT opinions that specifically deal with the same USTR report and FedEx report? Yes, Your Honor, and we do cite them in our brief, but I would also turn the Court's attention to one recently issued decision that we did not cite in our brief from the Court of International Trade as that decision came out subsequent to our response brief in that case, or in this present case, and that case would be the Jiaxing Brother Fastener Co., the United States case, and the citation, if Your Honor is interested, is 380 F. Sup. 1343. And in that case, I believe the Court of International Trade actually did a good job of explaining that these generalized concerns or concerns as to other products does not constitute specific and objective evidence supporting a reason to believe or suspect that the Thai data as to steel imports was distorted. What about the contention that there's an inconsistency between Congress's treatment of the Thai data in this context and other treatment of situations where there is possible government interference? Your Honor, again, I dispute that there is inconsistent treatment. I think the standard that Commerce applied in both of those cases— But just help us to describe what the difference is between the two situations. Sure, Your Honor. I believe Mr. Menegas was referring to certain situations. I don't believe they went into much specificity as to the actual evidence at hand in their briefs, but where Commerce disregarded or excluded certain export data because Commerce had reason to believe or suspect that the data was subject to subsidizing or dumping. And again, this is the same standard that Commerce would apply here, which is a reason to believe or suspect. And I don't believe that Jeanne here is contesting the reason to believe or suspect standard. And I don't think this Court has necessarily articulated what exactly a reason to believe or suspect means, but Commerce has, and the trial court has established that the reason to believe or suspect must be established by particular, specific, and objective evidence. And here, there is no particular or specific evidence that these Thai customs practices of which Jeanne alleges and which are set forth in the reports are particular and specific evidence as to these particular steel inputs being distorted. Now, I know Jeanne... You don't dispute that those problems exist in the Thai customs world, do you? We do not dispute that the USTR reports discuss that there are concerns with some Thai customs practices and particularly with regard to cigarettes and alcohol, but we do dispute that that constitutes specific or objective evidence that the data at issue in this case is unreliable. And I do want to move to Jeanne trying to tie that to the alleged aberrancy at issue in this case. First of all, it's entirely speculative on Jeanne's part that there is even a link between these alleged practices, which were not, again, specific to the product at hand, and any alleged distortion as a result of this, again, alleged aberrancy. All Jeanne puts on the record, and Commerce, again, specifically went through each of these sets of benchmark data and determined that they were not even appropriate benchmarks to measure the Thai data that Jeanne disputes against. As a result, there was no finding of aberrancy made, and Jeanne did not put any evidence forward to show that even if Jeanne's number of 26% higher is true, that that would, in fact, demonstrate aberrancy. In fact, the Court of International Trade has stated that Commerce would find aberrancy in a situation where the price at hand is many times higher than other benchmark prices. And here we're talking about 26%, one and a quarter times, whereas even the cases that Jeanne cites, we're dealing with things that are, I think, 2,300% higher or three times higher, which is 300% higher. So the order of magnitude is... Are you referring to the OK case? No, I'm referring to the pure bearing and the Jacobi carbons cases that Jeanne cited. And again, with regard to those cases, I think there is another point I'd like to bring up with respect to the data from the other countries that Jeanne offered up as benchmarks. Regardless of whether those benchmark data countries were economically comparable or not, one key factor is that at least for, I think, two of the three sets of data, China itself, which is the home market we're dealing with here, was part of that data set, and it would be inappropriate for Commerce to rely on benchmark data for which the home market that we're trying to figure out the normal value for is actually part of the data set, and which is also a non-market economy country. And again, Commerce is required to use market economy countries to try to determine a normal value. So as I said, there is no indication of aberrancy even if you take Jeanne Metal's 26% and the benchmark data offered at face value, but there's no reason to even do that here because Commerce made a reasoned determination as to why each of these sets of data were not reliable or appropriate benchmarks. And I would just like to finish up by talking a little bit about the specificity of the inputs. Again, Commerce is afforded wide discretion in valuing factors of production and determining the best available information. So even if Jeanne might disagree or even if the court might think there is a different way  is that a reasonable mind might accept Commerce's determinations or reasoning as adequate. And this is something that this court has held and that the trial court has always implemented. And here Jeanne is essentially asking this court to reweigh the evidence and substitute its judgment for that of the agency, which it should not do. Here Commerce went into actually a very large amount of detail as to why the Thai data was more specific than the Philippine data and the Ukraine data. And a lot of that depends on the carbon content, which Commerce has highlighted as an important factor. And one thing I would like to point out is that Jeanne Metal's, on page 4 of its reply brief, actually acknowledges that the Philippine data could be considered less specific than the Thai data. That in and of itself is almost a concession that Commerce's determination was at least reasonable or supported by substantial evidence, even if Jeanne might disagree. And then I would also like to just finish up by saying that Jeanne's arguments with regard to the specificity of the Thai steel wire rod and steel plate inputs, Jeanne only argues that that data is not specific as to its own inputs. It completely ignores the material inputs for the other respondent in this case, Stanley Nails. And Commerce's responsibility is to determine which the best available information is for both respondents, not just Jeanne. And in fact, I believe in this review, Stanley Nails was in fact the one that recommended and put the Thai data on the record for Commerce to consider. Finally, I just want to point out quickly that the record here lacks surrogate value data from the Philippines and Ukraine with regard to several other inputs that Stanley consumed. And so again, the Thai data is the only one with surrogate values for both respondents' material inputs. And with regard to the Ukraine data, Commerce did state that it was not just the specificity, although that was an issue, but that the Ukraine metal experts' data was not tax and duty exclusive. And tax and duty exclusivity is one of the five factors that Commerce considers when determining what the best available information is for factors of production. If this Court has no other questions, I just ask respectfully that the Court affirm the decision of the trial court. Thank you. Okay. Mr. Gordon. Good morning, Your Honors. May it please the Court. Adam Gordon on behalf of Defendant Appelli, Midcontinent Steel and Wire. I'd just like to touch on two main points, picking up on what Ms. Bay was ending on. The use of Thai wire rod data here, the pricing of Thai wire rod data, flowed from the selection of Thailand as the surrogate country. Thailand was selected as the surrogate country in the review in large part because only the Thai data on the record allowed Commerce to value all of the inputs for both respondents. Jian studiously ignores the existence of Stanley, but they are one of the two respondents whose inputs needed to be valued. And as Commerce specifically noted in its decision, the information for Ukraine and the Philippines did not contain values for all of the inputs. And, in fact, the inputs included a very important one. Commerce specifically called out copper-coated welding wire, which is fundamental to how one of the main types of the subject merchandise is actually manufactured. I'd like to shift gears briefly to the claim that the Thai wire rod values are aberrational. They are not. It is true that, on average, the Thai values that Commerce used are 26 percent higher than the benchmarks that Jian put on the record. But I will note that even within the benchmark values that Jian put on the record, those values differ by nearly 30 percent, from $601 per metric ton to $790 per metric ton. And also, the cases that Jian relies on, the two Jacobi cases, are fundamentally different. In those cases, the values at issue were 3,000 to 4,000 percent greater than the benchmark values. And also, in a second case, it was 300 percent greater, plus Commerce had evidence of the surrogate values in the past two reviews that was also fundamentally undermining the values that Commerce wanted to use in the challenge review. There's nothing on the record to support that type of analysis here. With that, I would end and request that the Court affirm Congress's decision. Thank you very much. Okay. Thank you, Mr. Gordon. Ms. Salzman? Thank you. Alexandra Salzman for the appellate. I'd like to discuss the three primary issues we've been discussing, the specificity, the USTR issue, and the benchmarks, all of which contributing together to the Department's decision. Just a brief comment on specificity. I'd like to comment more on the USTR reports. But on specificity, just as an overarching matter, which we argued, regardless of whatever specificity there may be in the Thai data, if they are aberrant and they are distorted, it doesn't matter how specific they are. You can't overcome that by being specific. And that speaks to other smaller issues in both records in Ukraine and Philippines. But more importantly with the detail, as we've argued at length in our brief, that type of detailed low carbon is not supported by Stanley and by Xeon Metals, that that level of specificity matters in our purchasing. We did discuss Stanley in our brief. Yes, we put more emphasis on our own client, but Stanley purchases low carbon steel, and they provided one of the ranges that they purchase under, but they say that they purchase low carbon steel as do us. And the condoms which lay out the product specifications for this product only specify low carbon steel under 0.25. The purchasing materials of our downstream customers, when they're buying nails from us, they're not asking for 0.10 to 0.12 in our steel content. That level of specificity is not supported by the record as mattering. What matters is whether it's low carbon or not. And for that case, you do have Ukraine both metal export, which the department has relied on despite the tax issue, and you have the Ukraine import price, which precisely matches the low carbon grouping that the department uses in product matching and that we use in our purchasing. So we've briefed that at length, how we actually determine our specificity is not in these little incremental overlapping carbon contents. And then again, even with those issues, specificity doesn't overcome an aberrancy and a distortion. We were discussing USTR reports a fair amount before. Just to be clear, we're not saying that you need to make a bright-line rule that Thailand can never be used. We're saying, Thailand, when you have something more, you have these USTR reports, and you have something more. You have the aberrancy that we've pointed to. And the Jacobi carbon case that we cite in our brief mentions that exact point. There have been other CIT cases addressing USTR reports and finding maybe they weren't specific enough. Jacobi, they said, we see that generality, but here you have more than just that. You have prices that are higher. So we're saying, we do have that something more, as Jacobi carbon said, here in this case. What about the fact that in Jacobi, the values were three times the average values? Do you think that's a distinguishing factor? No. So that case, one, it was a few different inputs. It wasn't the major raw material, and it wasn't a commodity price. When you're looking at aberrancy, it shouldn't just be a straight, if you hit 60%, you're aberrant now. You need to consider what type of product this is and how it impacts the downstream product. This is low carbon. Why is 26% aberrant here? Because it's a commodity price. This is what's driving the entire margin difference. As my colleague said, it's about double because of this 26% increase. This is different than if you have a case with a bunch of different chemicals, a bunch of different raw materials that are maybe not traded internationally as much. This is steel wire rot. This is a major commodity. It's the vast majority of the import cost. But the other thing is it seems to vary by more than 26%. 26%. But all of those are in a band or they're all in a range so much lower. We didn't provide just a very cherry-picked variety of things. We provided major world benchmarks that the department relies on in countervailing cases from international sources. We provided domestic sources in Thailand itself, export prices from Thailand, prices in the other circuit countries. This is a wide variety of prices on the record that are all showing that this Thai source is much higher than all of these other prices. This is a large realm of information that's on the record showing that 26% for a commodity price is a major difference. And also I wanted to correct a point with the USTR reports. They are not specific to alcohol and cigarettes. That's the WTO report on the record where there were allegations from the EU. The USTR reports are general. They're not discussing that they're not giving an example of just alcohol or just cigarettes. Do they give examples of alcohol and cigarettes? Not in the USTR reports, in the WTO report. Do they have examples at all in the USTR reports? No, you can read. They're being general about it. But that generality, which the department keeps bringing up, they're using it to dismiss basically any import value. You can't use these to support anything. The USTR, what data did they review? I am not sure. I know that they say that they're discussing with other exporters and the whole report, I mean, it's on the record. We put the whole report. You can look at what sources they reference for this annual report they put out on trade barriers. I mean, it's a government agency. Their whole role is to be involved in our trade. And they put in a very serious allegation. It keeps getting dismissed as a speculative concern. It can't be. This is the US government saying, Thailand, you're manipulating your import values. We're putting this in our annual report every year. This should not just be dismissed as a general concern. That's not happening. On this record, you have that report. And you have all of these different benchmarks. Ultimately, Commerce hasn't considered the breadth of information on this case. Instead, they keep dismissing information, not confronting information, saying this benchmark isn't exactly what we want to look at. Okay, well, I think we're done. Thank you, Ms. Sullivan. Thank you. Thank you all. Thank all the counsel. The case is submitted.